Hear ye, hear ye, Mr. Honorable Appellate Court of the Second Judicial District. It is now back in session. The Honorable Susan F. Hutchinson presiding. Please be seated. Your Honor, the third case on the docket this morning, 2-53-0076, Fountain Square on the River Condominium Association, SCV, Illinois Nonprofit Corporation, et al., plaintiff's appellate, v. RSC-Elgin, LLC, et al., defendant's appellee. Arguing on behalf of the appellate, Ms. Elizabeth L. Jones. Arguing on behalf of the appellee, Mr. Ronald Pincus. All right, good morning, counsel, and we do apologize for the delay. We've had a long morning, and it's going to continue into the afternoon. Yes, and you need to pull that down. Thank you. And you may proceed whenever you're ready. Thank you, Your Honor. Good morning, I can still say. You still can do that, yes. And may it please the Court, my name is Elizabeth Daldagiani, and I represent Fountain Square Condominium Association, which is appealing the dismissal of its complaint, all of its claims, and all of its claims. Against all defendants under 619A9 of the Code. First and foremost, and most respectfully, Your Honors, the circuit court's decision was an error. Because the role of the court on a section 2619 motion is to accept as true all well-pled facts, and determine if questions of material fact exist. And here there were multiple questions of material fact that should preclude dismissal in light of plaintiff's jury demand. While an affidavit was submitted by one defendant on defendant's joint 619 motion, the circuit court erred in imputing the contents of that affidavit to all defendants. Furthermore, plaintiff submitted evidentiary. Were there any responses to that affidavit? There were two verifications filed or affidavits filed by plaintiff. One by David Multak, the property manager of the Condominium Association, and one the current board president of the Condominium Association. Why aren't they called affidavits? Why are they just called verifications? That's a good question, Your Honor. I was not counsel at the circuit court. But nonetheless, they had the required verifications that they were under personal knowledge and signed under oath. So whether it was called a verification or affidavit, it served the same purpose. The reason that the circuit court disregarded the verifications or affidavits, those sworn statements, were because it decided that they didn't actually attack Lee's affidavit. But they did attack Lee's affidavit. Furthermore, the circuit court disregarded all the well-pled allegations. Plaintiff's brief appeal and reply brief detailed those errors. I'll highlight a few of them and try to answer your questions as best I can. Briefly and quickly to summarize, the operative complaint alleged that the bank acquired a successor developer, the Fountain Square property, with construction defects, and then appointed its employees and officers to serve on the building's pre- and post-turnover board at the direction and control of the bank. Those bank board members then withheld information regarding the construction defects, the expert reports on those defects, and the suggested long-term maintenance and repairs from the association, the other board members, the property manager, and the reserve study contractor they hired to contribute to budgeting analysis. This resulted in a severely underfunded association reserves. The withholding of this information for years had long-term financial consequences. Defendants withheld the information to spare the bank the expense of necessary repairs and paying sums into the association reserves to address the defects while they were in ownership. Who was that information withheld from? So that information was withheld from the... And what specifically was it withheld? The WISJ reports, the WJA reports from 2009, the NOVAC reports regarding construction defects, all the other information regarding repairs during that time, including recommended maintenance, like continuing to do sealants every five years, none of that was provided to the association's other board members, to the association's business records, right? No one would think that those reports would be in the association's business records, nor were they provided to the property manager who maintains those business records, but also BRI, the reserve study group that was hired to look at the building and determine possibly what kind of reserves they might need to keep, what kind of work they might need to do in the future. None of that was provided to anybody else. The bank simply walked away, did not tell anybody about the long-term concerns about the performance of the windows, the leaks, and the other possible causes, the every-five-year needing to reseal. And so what happened... But didn't the... didn't the... what is it? BRI, I guess, is the name that did the reserve accounting or reserve evaluation. Didn't it talk about... didn't that evaluation talk about things that would have to happen in 2007, 2017, and then again 2027? So they knew that things... they anticipated things would have to be done, including replacement of some windows in 2017, but they felt that there was sufficient... there were sufficient reserves? Respectfully, Your Honor, yes and no. And what I mean by that is BRI was never provided with any information from the 2009 reports or correspondence from WJE. But they did an entire inspection. No, they did not. Okay. If I could, Your Honor, the BRI study actually had a disclaimer that it is based solely on information provided by the property manager and the association. We know that did not include, because of the verification of Mr. Maltak, did not include any of the 2009 reports or information. And also that disclaimer said that the accuracy of whatever was provided to them was presumed, it did not investigate or take responsibility for any hidden or latent defects, and they did a non-invasive visual inspection. So if you have a latent defect here, which requires opening up wall to wall, maybe removing part of a facade, that's not something they would have done. They would have just walked around the building, taken pictures, and seen possibly what they could see from their eye, but not a full inspection like what WIS-JNE would have done. The WIS-JNE inspection was specifically to look for these root causes, pull back materials, open up walls, and find out what's going on. That's not what a reserve study does. But after NOVAC, excuse me, did the sealant and got paid their last $250,000 or whatever that amount was, $225,000, didn't WIS-JNE do a, or somebody associated there, because we've got them in two different firms, I guess, and there was a conflict waiver, didn't they do an inspection, and isn't that how NOVAC got their final payment? So there's two answers to that question, or two parts to that answer. First of all, this unqualified certification rebuttal that's being talked about in the briefs, this December 2009 letter that comes from WIS-JNE, there are certain things in the settlement agreement with NOVAC, which was largely organized and run by the bank, right? The settlement agreement required that any repairs to be done had to be at the satisfaction of the bank, not WIS-JNE or anybody else, and that it had to cover 100% of the punch list items have to be corrected. In the July 20th proposal, WIS-JNE said that they would, upon completion of field testing, prepare and submit a written report with final analysis regarding the pertinent design and construction issues, and a water testing and final report. They did not, that letter does not include either of those things. That letter also references a September 9th testing report that's not in the record and was never provided to the association at any time. But we know what it is today, and we know that they signed off, or NOVAC wouldn't have gotten paid. So I would argue that that's a question of material fact. And the reason I argue that is because all causes of the water infiltration, that's not in the December 2009 report. Neither is 100% of punch list items having been corrected. And at Lee's deposition, when asked that question, does this document say 100% of punch list items were corrected, he said no. And at this point, you know, WIS-JNE is a client of the bank. They are giving some recommendations, and the bank is taking them or leaving them. And the bank wants to get this project done. This is in the time period of the 2008, you know, mortgage crisis, bank and housing crisis, frankly. And they took on a property riddled with debt that had systemic problems that they knew from 2008 and had continued damage that would be done over time with repairs that would have to just keep going. And at that point, we know WIS-JNE sends this letter that does not conform to the settlement agreement. It does not say 100% of punch list items corrected. And we know that it also doesn't say that all causes of water infiltration have been corrected. It just says that active leaks don't appear. And what's interesting is if you look at the other WIS-JNE letters or reports, you'll see that the way they use active leaks is in the course of the testing with their naked eye. There is an active leak. There is no leakage or there is an active leak. And importantly, that happens three different times. They also use the word presently active. So when they say no active leaks, one would think that might mean at the moment that they're spraying water, at that point they don't see that active leak. But that doesn't mean that all causes of water infiltration have been corrected or that 100% of the punch list items have been corrected. We know that there were lots of reasons that WIS-JNE believed there were water infiltration was caused. The punch list issue is really not part of, at least as I read the agreement or the situation, it's not part of the leaking. There were other things that had to be done in the building because RSC didn't finish something. But NOVAC's responsibility was primarily to make sure that these windows weren't And the balconies. Yeah, and the balconies. They said, I'm sorry, it was Gottfried who later became part of the, I guess, this other firm with WIS-JNE or something of that nature. He said that the corrective work attributed to previous exterior sealant and window deficiencies of Fountain Square appears to now provide watertight performance. We consider our role in this project now complete. And that's how the 275, I was off by 50,000. The 275 got paid to NOVAC, correct? Your Honor, again, I think that there's more reasons for the water infiltration than just the windows. This case is not just about windows. There's balconies, there's facade leak, there's EIFS wall. And what's interesting is that in the 1.7 million that the association has had to pay out for many of these things that WIS-JNE pointed out way back when and said you need to correct and fix these, and we cannot endorse the window sealant approach. These things that have now been corrected or are being corrected include much greater than just windows, just like WIS-JNE said it would be. It was also the walls. It was the balconies. There was aluminum issues. So it wasn't just pertaining to switching out some windows. All right, but now let's go to 2014 when Mr. Campbell and his group bought the remaining, excuse me, the 58 remaining residential units, two commercial condominium units and 72 parking spaces. That agreement appears to be an as-is agreement. And it also appears that Mr. Campbell should have or did look at this building, although the extent of his investigation isn't clear from the record. But he's accepting it in 2014 as-is. And the leaking does not start again until 2015, correct? So a couple of points to that, Your Honor. First of all, leaking did begin earlier. It began in 2011 when the association, run again by the Bank Board, had to reseal, and we know that because in the minutes it mentions that. But it doesn't mention anything about there's been a history of leaking. There's been a history of problems with the windows. And the association board didn't tell anybody at that point, hey, we might look back at these Wischaney reports. You might need to know something. Maybe that will inform what we need to do to fix here. None of that was in there. So in 2014, you know, when Northampton purchased, they purchased some of the units, but there are also some units that are purchased by other people. And this lawsuit is by the association as a whole, not by Mr. Campbell and not by Northampton. But he is one of the board members. He is one of the board members. And he has the majority of, he had at the time before he sold them, the majority of the units in that building, correct? He purchased, Northampton purchased a majority of units. That said, an as-is clause is never a defense to fraud. And I know we cite in our briefs also the High Street case, you know, the Judge Kapora's decision on that. A non-reliance clause, when there's a duty to speak, is also not a defense, even at summary judgment stage. There is necessarily a question of fact there. And that's because when you've alleged fraud and there is a duty to speak, which there is, and I'll explain one other point. You know, commonly when you purchase a condominium unit under Section 22.1 of the Condo Act, you have to turn over documents. And those include minutes, association documents and reports, so buyers know what they're getting. And by not putting into any association records the leaks, the history of this building, you're malinforming the future association as to what's happened. That's like going to a doctor and not telling the doctor, hey, my leg hurts, but oh yeah, I broke it three months ago and didn't put it in a cast, right? That's true. But there were units that had been sold by the time that the Northampton Group had purchased, and there were people living in those units that could have been talked to about this. Did that ever happen? Your Honor, the record is not clear on that, but what I can say is that the record here is completely devoid of the association and the board members and the non-bank board members ever having been informed of the ongoings of 2009, the systemic building defects, the latent defects, and the need to reseal and recalk every five years. You know, if you're a unit owner and you see that there is some water leakage, you wouldn't know in context that this is part of a greater problem because they never said that, and they had a duty to do that. But you would contact someone. You would contact the board, which was formulated by the time of the transfer to the bank, and you would contact them to do something about it because that's what condominiums are about. People move into them because somebody else can do the dirty work, so to speak, and that would be the condominium association because in their fees that they charge, they do create a reserve for any problems that occur. So the Northampton group could have talked to some of those people and said, hey, any problems here? Your Honor, I know my time is up. If I can just briefly answer your question. They could have, but it's not about Northampton here. It's about the bank and their bank board members who were their employees, who they had a duty of loyalty to the bank, and they also had a fiduciary duty to the association. And when you are on a board of an association, you're supposed to act with the utmost care, honesty, and diligence, and you're supposed to act in favor of the association and against any self-interest or interest of other parties. And not informing the property manager who manages the day-to-day of what's going on in the building, who handles the complaints of the unit owners and who advises the reserve study group of the latent defects in the building, and not informing the property manager who manages the day-to-day of what's going on in the building. That's what should have happened, and that's what their obligation was. The bank board members didn't even inform the other association members when, after turnover, there were two members who were part of the board who were not affiliated with the bank. The bank board didn't tell them anything. And Mr. Lee, in his deposition, doesn't recall telling anybody anything. And Mr. Moltak, in his verification, says, I never heard anything, nobody ever gave me anything, I never received these documents. So at a minimum, we have a question of fact on that basis. And furthermore, as to anybody's reliance on any document, you can't have that reliance if you didn't supply the proper information to the reserve study group, if you didn't provide it to the property manager. There's no way that anybody in this association would know anything because the bank didn't leave that material behind. Thank you, Your Honor. Justice Shostak, go ahead. You will have an opportunity to respond after counsel finishes, if you choose. Thank you, Your Honor. And I may not be able to talk by that time, but hopefully. All right. Mr. Lipinskis? I'm going to make you say it, and you said it right. Thank you. Yes. Let's see, good afternoon. Yes, it is now afternoon. Yes. May it please the Court, Ron Lipinskis on behalf of the bank and the officers, the appellees in this case. There's one thing you just didn't hear about for the past 15 minutes, and that's what Judge Villa's decision is based upon. It's the business judgment rule, and we didn't hear word one about it. That entirely changes the landscape here. I can't blame them for wanting to do a do-over and to try to come up with other arguments, but they are confined to what the record is here. The record, let's start with Wish Janney. We throw that around. I was unfamiliar with all this engineering stuff before this case began. Wish Janney is the equivalent of, like, Skadden Arps, you know, if you want a legal opinion, or the equivalent of going to Michael Jordan for a basketball advice, that sort of thing. They are some of the world's best water infiltration engineers. In the record, you'll see they've worked on Fenway Park, the AT&T Stadium, 9-11 Memorial, Sydney Opera House, on and on. But they did. Well, I'm not sure if it was Gottfried alone or Wish Janney together. It was Gottfried. They recommended things beyond just patching up the sealant, didn't they? At the dawn of the engagement, the engagement began in the summer of 2009 when the bank came into this property via foreclosure and had a list of items that they needed to have fixed. As is always the case with new building developments, and at the top of the list really were these water infiltration issues, literally at the top of the punch list. And when Wish Janney came aboard, yes, the initial reaction was maybe these windows need to be replaced. Maybe other efforts need to be done. The engagement continued, though, through the fall and then into the winter. And that involved a lot of testing and repair work by Novac Construction. I'm sure you're familiar with Novac Construction from all the billboards in the Chicagoland area. They did all of this work, and ultimately in December of 2009, they concluded, or Wish Janney, after seeing all the testing, concluded that there was watertight performance and closed the file. Did they open up, or I'll ask it this way, did they open up this wall? Did they do things other than just eyeball it? There's nothing in the record on that, Your Honor. I mean, except what you find in the reports. We don't have that in the record. By the way, we had a 2-hour oral argument on all of these facts down below, and that wasn't raised there, either. So, yes, there were some thoughts at the beginning that could be looked at, but that's kind of like asking, well, what was the score in the second inning of the game? Well, at the end of the game, the Cubs won. In the second inning, maybe not. Exactly, right, sometimes. Or, like, for instance, you could say, well, let's not pay attention to this final judgment because there was a prior interlocutory order, which differs. So I question the final judgment because the judge thought something else earlier on in the case. It's the final order that matters. It's the final judgment. But even to be charitable to the other side on this, as Judge Filler really was in his opinion, it's a very thoughtful, thorough opinion, dealing with what they actually argued there, which is much narrower than what we have here. He said, okay, at best, you really have two different options that might have been taken. And now you're in the realm of second guessing. You know, the board, once it has sufficient information, once it's active with due care to give itself sufficient information, which would be the retention of Wishtyanny and having them do their work and their testing and that sort of thing, overseeing all of that, then the board is within its rights to go one way or the other. We don't have trials over that. We don't convene juries to second guess the boards when it comes to that sort of thing. Not only is it not in dispute what Wishtyanny's expertise is, but look how the contract was set up. I mean, the board, the bank members, they don't have this water infiltration experience, right? You turn to an expert. If you need a legal opinion, you go to a law firm. This isn't a loan matter. This is water infiltration issue. And what they did was they gave Wishtyanny kind of the whip hand, if you will. The NOVAC construction needed to satisfy Wishtyanny. So when we talk about financial self-interest and that sort of thing, actually it would have been more in the self-interest of Wishtyanny to kind of keep the engagement going, but instead they decided that the repair work had succeeded and they moved on. So how does the business judgment rule come into this issue with first the bank board, because Mr. Lee was on the bank board and I think he might have been one of the ones retained on the second board that came through. It's the condo board, Your Honor. It's not the bank board. I'm sorry, the condo board. I apologize. How does that come into play? This kind of board is just as entitled to the benefit of the business judgment rule as any other type of board. There are other condo board cases. Goldberg, Swan, Carney, there's another, I think there are maybe three or four cases that we've cited where condo boards or other types of associations are entitled to a business judgment rule. But as a matter here and how it applies, it's brought under 2619, as you know, and via affidavit and then the other side needs to amend its complaint to deal with those allegations or move to strike the affidavit or submit its own counter affidavit or verification, if you will. It was mentioned by plaintiff's counsel that they had submitted two and Judge Follett went through that. Again, we had a long oral argument. This is after years of discovery, by the way. He decided that of the two affiants, one affiant came onto the scene in 2014. That's Mr. Campbell, who was mentioned earlier. He had no personal knowledge of what he was opining on regarding the Wish-Danny reports in 2009. The other person was basically offering a quasi-expert opinion as to what the reserve study engineer would want to see. The property manager is not a reserve engineer. If you want to have that kind of evidence as to what a reserve engineer would want to look at, then go hire one. How could they look at anything when they were never informed of any of these? That's similar to my question, which is the allegations concerning bad faith on behalf of the board members who were there before. How does the business judgment rule address an allegation of bad faith with the intent of maximizing the bank's profits? The Wish-Danny engagement was in 2009. When it concluded, the problem was resolved. It was in the done pile. There was no problem. It had been fixed. What they're talking about here, and it's very mulled. If you go back and you look at the response to the 2619 motion, you'll see it's basically a long series of factual quibbles and a bit of a rant, if you will. I should have better word than that. Fixed or not, I think the allegation is they weren't told and that that is bad faith. I was trying to set this up, Justice. The 2009 engagement with Wish-Danny is one thing, and that ended. What they're referring to, although it's far from clear in the underlying stuff, they're referring to a later board, the turnover board is what it's called, in 2010. They did not offer any law to Judge Villa. They did not make any coherent argument that there was a duty to tell a success, a later board, the turnover board a year later as to something that had been fixed the year before. You've got to flush that out. You've got to have cases. You've got to make an argument. You need some evidence just because they have an assertion that something wasn't disclosed. So what? Where's the legal duty? There wasn't a problem. Wish-Danny had fixed it and certified that it had been fixed. There's no reason. Only if you assume that there was still some gaping construction defect and some problem would you even have something to talk about. But if it had already been resolved, then what is the point? The court is really being asked to create a new legal duty to basically say everything, to turn over every single thing that you can possibly think of to later boards or else face some sort of liability. There needs to be some judgment, some materiality. In the board minutes, I'm sure I didn't read any, I apologize, and I will, but in the board minutes, do they mention that they had engaged Wish-Danny? No, because it was in the dump pile. It was over with. No, but in the first board. It wasn't in the dump pile. In 2009, it had been taken care of. But in 2000, when they took over and paid Novak,  under a trust, I believe. In 2010, there was a turnover board. Did anybody note the engagement of Wish-Danny? I don't think that's in the record, Your Honor, one way or the other. Again, there was no legal argument made down below. Judge Villa repeatedly notes his frustration with the plaintiffs in his order, which is very well done, but it's not my duty to come up with your arguments, decipher what you're saying, and supply case law. There is no case law that there is a duty to report something a year later to others where the problem had been fixed. I have a question for you. If the business judgment rule defeats a breach of fiduciary duty, does it necessarily follow that constructive fraud is also defeated? Yes. If the board actually do care and goes out and hires a third party or reputable qualified to handle an issue, then the burden shifts to the other side to defeat that. It's basically a statutory immunity. It's a judicial rule here in the state of Illinois that, yes, it would defeat that. Boards all the time are accused of breaching fiduciary duties and then they invoke the business judgment rule. I might say two about it. There are a lot of things I heard a few minutes ago from plaintiffs' counsel, one of which concerned the building reserve study. That's an independent reason to dismiss the case because the argument is there are water issues and therefore you're under-reserved. Even if there were, the building reserve study thing, which was done a year later in 2010, that's an independent reserve analyst and an independent engineer who comes in. The engineer looks at the building. It's like a mechanic popping open the hood. They make it sound like they're relying on the association. That's not the way it works. The engineer comes in. It's an 80-page report. You can read it yourself and see what he did. Then he gives the information to a reserve analyst and the reserve analyst comes up with the numbers. That's an independent reason, an independent exercise of what the board did that deserves the benefit of the business judgment rule. They didn't do anything to defeat the business judgment rule down below. These are basically procedural arguments raised throughout their brief that weren't raised below. In fact, if you look at the opposition that they raised on the 2619 motion in the record, I encourage you to start with it. Again, it's a long recitation of not really arguments, but just points, factual points and that sort of thing. There's only one small block of cases in there. It's just like the generic cases on the business judgment rule. Six or seven cases. None of those cases are even cited in the appellant's brief here. It's a whole new case. It's a whole do-over. It's 30 cases that are different than those cases. These are different arguments that were raised. Judge Villa, this case went on in discovery for many years. To talk about it as a 2017 caption, I filed this motion in 2018. They asked for discovery. It's fine. You got the entire loan file. You got wide e-mail searches. They served a subpoena on Lischiani. They deposed one of our people. They didn't depose anybody else. They're asking now for this case to go on for another seven years based on speculation and inferences. The turnover board is our current plaintiff, correct? It's a later board. When Northampton purchased this property in 2014. It's the initial turnover board. It was involved in whatever... What was it? 2014? The voting control depends on who has the greatest number of condo units. That was Northampton. But in the verifications that were filed by Mr. Multac and Mr. Campbell, Multac says that Brayside didn't know any of these, was never provided any communications or documents from Lischiani or Novak. But Campbell's verification details his familiarity with the DRA reserve study, the Lischiani reports and communication, and the costs incurred for repairs since Northampton's purchase of the building in 2014. In fact, the owner of the majority of the condos who was then selling them to other people did have this information, but the property manager didn't. Is that a fair statement? Because of the review standard brought on under 2619, I have to... I don't know that that's true. I don't know that I believe that, but I can't contest that based on what the record has in it at the moment. Well, they're noted in pages here. And then Lee responds that as a board member, when he first got involved in 2009, it was... the big problem was water leaks, and he wanted to stop the building from leaking permanently and forever. And so that was his... that's his statement. But again, where is the business judgment rule coming into play? That is this board retaining an independent expert, one of the world's finest, to give an opinion on the efficacy, the adequacy of the remediation efforts of NOVAC construction. And when they came back and said watertight performance, then we're entitled to rely on that. And if there's a problem with that, then that isn't with the board. That's with one of the other folks. Maybe that's construction defect involving NOVAC. Maybe that's something involving Wish Janney's opinion. But we don't believe that there was anything wrong with the Wish Janney report at all. But if Grayside doesn't know about that, then how can it not be the board's responsibility? When you say that, the antecedent to that in my ears is the unqualified certification, the watertight performance, we're closing our files by Wish Janney. The problem was fixed as far as the board would have had any reason to know based on one of the world's best experts on water infiltration. So there was nothing material. Okay. Do we have any questions? All right. If you wish, you can sum up and give us your recommendation for what we should do here. I would strongly urge the panel to affirm Judge Villa's very fine and detailed opinion based on a thorough argument and a great deal on the record. We haven't talked about waiver. We're not going to. Thank you, Your Honor. Take care. All right. Ms. Al-Dashani, if you want to reply, you may do so. Thank you, Your Honor. I will try to handle a lot in five minutes. First, Your Honors, this is de novo review. You don't have to give any deference to what the Super Court judge found and why. Business judgment rule, which I can now get into, I'm sorry, did not earlier, is not a bar when there is a dual interest and conflict of interest alleged here. And I would point this Court to Kye v. Board of Directors of Spring Hill and Henderson Court v. Lab. These are cases that are cited in the record. Everything that I brought up today and in our briefs is in the record, in evidence or in arguments. In Kye, it was a 2619 motion where the business judgment rule was found not to be a bar at the pleading stage, just like we are here. And in that case, Kye had alleged the defendant board members had a dual interest and had not acted in the best interest of the association. Same thing we're alleging here. And in our case, of course, they had a duty of loyalty to their employer that had directed them to be on the board. Well, they're employed by that party, but they have an obligation to manage this condominium association with its 58 open units and however many sold units there were. That was their job. And there's nothing, and the bank even created a separate entity to be a kind of a holding company for this property so that there was no, what I would assume, any direct interference or any problem directly with that board through that company. I understand the concern, Your Honor. The bank board defendants controlled the bank for five years and that's a point that I think was missing. Yes, the association. They controlled it from 2009 until Northampton bought in 2014. And I think that's a point that's been missed in opposing counsel's argument. And here, plaintiff alleged that the association, the bank board members acted in the best interest of the bank and not the association. And that was enough in Kai. Alleging a conflict of interest, alleging bad faith and fraud was enough at the pleading stage to find that business judgment rule was not a bar. And that's a case that this court decided. In Henderson Square, a board members were sued for not doing repairs and not adequately funding reserves. Same issue here. When the bank board members left in 2014, they left $300,000 in their reserve account despite Ms. Janey saying you need to fund the reserves. I'm sorry, despite BRI saying even in their reserve report where they weren't provided all the information that it's best business practice, you need to fund the reserves for projects that are coming, not do special assessments. And they didn't do that. And even BRI said increase the amount of reserves. And they didn't do that. Let me ask you this question. When this new board took over, I mean, I'm sure they could have done their due diligence. I mean, there was this lawsuit in October 08 that really laid this out. I mean, the third payment was really dependent upon whether or not they followed the recommendations of Ms. Janey. So could they not have found this out prior to this new board coming on? So quickly, Your Honor, the different boards we talk about, there's the pre-turnover board, which is 2009-2010, which is solely bank board members. Then there is the turnover board, which is bank board members with the majority and a couple unit owners. How about the 2014? And then in 2014, the bank sells, they leave, they tell nobody nothing, and they get out of debt. But that's what I'm saying. The people that took over in 2014, they have done or the lawyers have done a check on this property and found that this lawsuit was out there and that there were certain conditions with respect to this lawsuit. So, Your Honor, I don't believe that any of the 2009 Wiss-Janey reports and those defects and those fixes would have been in any lawsuit records or in a public record because the settlement agreement was executed in what, June of 2009? And then the Wiss-Janey report, in fact, that settlement agreement was executed without even the bank getting a Wiss-Janey report in the first place. And the Wiss-Janey reports and work come after the settlement agreement. And further than that, the onus really isn't on the buyer at that point. They had a duty to provide these documents and information to the association records so that, you know, association records run with the association and not with the board members. The board members come and go, and the association records are meant to be there as a guide for the future board members to look back and see what happened, like in 2011 when leaks started again and the bank board members said nothing and just allowed people to go do a Band-Aid approach and told nobody nothing. And the business judgment rule is not meant... Hold on. Mr. Campbell says that he is aware of the Wiss-Janey report in his verification. He is aware of these things. How he finds out, maybe he did some due diligence on his own. But he doesn't say how. He just says he is aware. So if he is aware, how can he now say that he did not know? Your Honor, the record is clear on that point, actually. So it was alleged in the complaint that the association didn't know anything about Wiss-Janey until 2016, until the leaks started in 2015 and they reached out to Wiss-Janey to ask if they could participate in helping figure out what caused the leaks. Mr. Maltek averred that in his affidavit and Mr. Campbell... It's just ironic that they called the same people. As far as I understand, Your Honor. I can't speak to that point from the record. Just going back to the business judgment rule here and Kai and Henderson, it is clear that a question of fact to be decided by the trier of fact is what constitute reasonable budgeting. That's an Illinois Supreme Court case finding that a question of fact is on reasonable budgeting. And here we allege that there was not reasonable budgeting and reserves because the bank board members didn't inform the property manager who does the day-to-day work. In fact, Lee, I believe in his affidavit and deposition, says that he relied on Multac as his expert. And he tries to eschew the business judgment rule. He tries to say the business judgment rule applies because he relied on Multac. But the 28 people who were already in the building, I think, or the 28 units, I think that's the number that were already sold, do not have to finance the next 30 years. As each new unit owner comes in, they are assessed, and that's how the reserve is fixed. So, I mean, in 2014, there were only certain units that had been occupied. The other 58 are being sold. And that's where the reserve gets built up. And that's what happened here, or that's what should have happened here with that board. Your Honor, the reserve wasn't built up, though. BRI said build up your reserve, and they didn't do it. Well, how is that the banks or the company holding this property, how is it their fault when they can't over-assess the existing owners? Your Honor, the bank's board's responsibility was to the association before anybody else. And the BRI is telling them, increase your reserves, and they didn't during their time of ownership. And so during the time of ownership, which they continued for another 4 or 5 years, the BRI is saying increase, and they didn't. And with the future costs of the seal and fix in 2011 and other costs down the road, there was a need to reserve. And again, that's a question of fact under Henderson. And the business judgment rule here, when you've alleged fraud, and if you look at Stamp, that case, the business judgment rule didn't apply because the plaintiff did not allege that the defendants did not make informed judgments or not use care in arriving at those decisions. Or the defendants had not acted in fraud or acted on anything in the best interest of the entity. And here we did that. So just in closing, I know my time is up. I apologize. The Lee affidavit was one affidavit from one defendant. Nobody else was deposed because nobody else submitted an affidavit to support the 619 motion. The majority of defendants did not submit an affidavit saying that they acted in the best interest of the association or not. That what they did, what they relied on. All those required elements for business judgment rules to apply. Some of those people were gone. RSC was long gone. They dissolved by the time this all occurred. Your Honor, I'm not talking about RSC. You're talking about other defendants. No, I'm talking about the bank board members. I'm sorry. Other defendants. Yeah, I mean other current defendants. RSC Elgin is not currently a defendant at present. And what I mean is the other bank board members, in addition to Lee, Burton, Heitkamper, Olson, the majority of them are still employed by the bank. They did not choose to suspend an affidavit to defend any of their decisions. And here, the business judgment rules shouldn't apply. When we alleged what we did, we contradicted what he said. And not all defendants even brought their burden for why a business judgment rule should apply. Thank you, Your Honors. We stand our briefs and respect the request for personal. All right. Thank you, counsel, for your argument. We'll take the matter under advisement. We are going to recess again and get ready for our next case. Thank you.